1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7  BERNARD GORDON,                          )   1:04-CV-05363 LJO-DLB HC
                                            )
8              Petitioner,                  )   FINDING AND RECOMMENDATION
                                            )   REGARDING PETITION FOR WRIT OF
9     v.                                    )   HABEAS CORPUS
                                            )
10  C.K. PLILIER,                           )   OBJECTIONS DUE WITHIN THIRTY (30)
                                            )   DAYS
11             Respondent.                  )
                                            )

12

13         Petitioner Bernard Gordon ("Petitioner") is a state prisoner proceeding with a petition for writ

14  of habeas corpus pursuant to 28 U.S.C. § 2254.

15                          **State Procedural History**[1]

16         By information filed May 22, 1984, petitioner and his brothers, Patrick
    Gordon and Michael Caputo, were charged with various offenses arising out of the
17  December 18, 1983, robbery and murder of Loomis armored car guard William Camp
    Wiley at a Stockton, California, Kmart.
18
           The brothers' cases were severed, and petitioner was tried in Fresno County
19  following a change of venue. His first trial ended in a mistrial when the jury
    deadlocked. Prior to commencement of petitioner's second trial, the prosecutor
20  (Michael Platt) informed defense counsel (Steve Woodson) that an informant (Mark
    Mikles) had been located, and that Mikles possessed extensive information
21  concerning the Kmart murder and robbery. [FN2]

22              FN2.  We take judicial notice of our records and opinion in the prior
                consolidated appeal and writ in this matter. (*People v. Gordon* (June
23              11, 1992, F010369, F015109 [nonpub. opn.].)  The determinations we
                made in that opinion are incorporated herein by this reference.
24
           At the second trial, pursuant to a defense motion to exclude his testimony,
25  Mikles testified in limine concerning his criminal background, history as an
    informant, and relationship with Los Angeles County Sheriff's Deputy Lavonna Shea.
26  Mikles also related the cases in which he had previously testified, including those of

27  _____

28         [1]For efficiency the Court will adopt the procedural history as set forth in In re Bernard Gordon, No. F0333331, 2002
    WL 1163606 (Cal. Ct. of App. June 3, 2002).  See Answer, Exh. 2.

George Gomez, Joseph Luna, Earl Lloyd Jackson, and Joe Humphries (all homicides), as well as several drug cases. Mikles testified concerning the consideration he received in those cases, which was never monetary, but basically amounted to his testimony being taken into consideration in modifying his state prison sentence from six years to probation. (F010369, typed opn. pp. 183-187, 197-200.)

Mikles described meeting petitioner in the San Joaquin County jail in 1985, where Mikles was an inmate and barber. Over time, petitioner gave Mikles information about his case. Mikles possessed this information for approximately two years before telling anyone. He testified that he was hoping to be placed in work furlough or some type of program that would release him from custody in return for his giving information in a San Joaquin County case involving defendants Madden and Kikume. With regard to testifying against petitioner, Mikles had requested only that he be protected and that his family be relocated, since Michael Caputo had Mikles's home address. (F010369 typed opn. pp. 183-200.)

The motion to exclude was denied; however, petitioner's second trial again ended in a mistrial during jury selection, this time due to disqualification of the trial judge. San Joaquin County Superior Court Judge John F. Cruikshank, Jr., ultimately presided over petitioner's third trial, which was again held in Fresno County. (F010369 typed opn. pp. 4, 182.)

Petitioner's renewed motion to exclude Mikles's testimony was denied. At trial, Mikles testified that petitioner admitted participating in the Kmart robbery and homicide; however, Mikles waited almost two years before revealing this to authorities. Mikles told the jury about cases in which he had previously testified, and explained that he had learned years ago that if he helped law enforcement officers and prosecutors, they would help him. For instance, Mikles supplied information in the Madden-Kikume matter in order to assist his wife, who was in jail. At the time Mikles provided information in petitioner's case, he was in custody for violating parole. He was scheduled to be released on December 6, 1987 but, after he came forward, he was actually released on November 19, 1987. When Mikles was contacted by the prosecutor in petitioner's case, all Mikles asked was to have his wife relocated because petitioner's brother possessed Mikles's home address. Mikles admitted that law enforcement would not give as much for testifying in, for example, a theft case as for in a murder case, and he conceded that if an inmate went into detail in speaking about his own case, it would not be difficult to take that information and turn it into a confession. Mikles also admitted threatening lack of cooperation in this case as a means of pressuring law enforcement agents into keeping their promises about providing him with commissary money. Mikles testified that although he considered himself an honest person, at times he was dishonest in order to obtain drugs or "cash" stolen credit cards. He also admitted trying to lie himself out of trouble with law enforcement. (F010369 typed opn. pp. 46-56, 182.)

Petitioner's jury convicted him of robbery and special-circumstance murder involving the use of a firearm (Pen.Code, §§ 187; 190.2, subd. (a)(17); 211; 12022.5). On May 13, 1988, petitioner was sentenced to life in prison without the possibility of parole plus two years, and he appealed. (F010369 typed opn. pp. 4-5.)

After trial, information came to light which largely concerned the workings of informants in the Los Angeles County Jail system and Mikles's testimony, in this and other cases, about the consideration he received for providing information. (F010369 typed opn. pp. 217-258.) Accordingly, we affirmed petitioner's judgment on appeal, but, with respect to the consolidated petition for writ of habeas corpus, we issued an order to show cause returnable before Judge Cruikshank, assigned judge of the Fresno

County Superior Court. (F010369 typed opn. pp. 260-261.)  Our opinion directed Judge Cruikshank to hold an evidentiary hearing and make findings of fact and conclusions of law concerning (1) whether representatives of the state failed to disclose to petitioner substantial material evidence bearing on the credibility of Mark Mikles; if so, what information was withheld; and, if such information was withheld, whether the People established the failure to disclose was harmless beyond a reasonable doubt; and (2) whether Mikles testified falsely in petitioner's case; if so, whether the false evidence was substantially material or probative on the issue of guilt; and, if so, whether the People established that the presentation of false evidence was harmless beyond a reasonable doubt.  (F010369 typed opn. pp. 258-259 & fns. 53-54.) We denied the petition to the extent it requested additional relief. (F010369 typed opn. p. 260.)

Evidentiary proceedings began before Judge Cruikshank on August 28, 1995, and continued intermittently. On February 23, 1999, Judge Cruikshank filed findings of fact and conclusions of law. With respect to the nondisclosure issue, he found in part that the Los Angeles Sheriff's Department and Detective Shea failed to disclose files maintained by Shea which documented her dealings with Mikles. Judge Cruikshank also found that Mikles was part of the Los Angeles County jail informant scandal investigated by the Los Angeles County Grand Jury in 1989-1990. Judge Cruikshank further found that none of the impeaching information or materials possessed by various agencies were provided to petitioner at the time of his trial, although Deputy District Attorney Platt provided some impeaching information to petitioner. Shea and certain other people who had had contact with Mikles were not aware of the various discovery orders issued by petitioner's trial court and did not disclose any impeaching information. Judge Cruikshank concluded that "[t]he absolute arrogance of [the various] agencies in disregarding the court's [discovery] order is reprehensible." He further concluded that the prosecution in this case "had the responsibility to search out information concerning Mikles from every agency operating under the authority of the State of California." Judge Cruikshank found that petitioner's trial attorney possessed and used impeaching information concerning Mikles's background, which had been provided by the prosecution, and that the information requested and not received by petitioner only added more information with which to impeach Mikles. Accordingly, Judge Cruikshank concluded that, under the circumstances of this case, the undisclosed evidence was not material in view of the other evidence which was used to impeach Mikles. He also found that admission of the evidence sought by petitioner would not have been favorable to the defense, again in light of the other impeachment evidence which was presented.

With respect to the false testimony issue, Judge Cruikshank found that Mikles admitted having lied at the trial of Earl Lloyd Jackson, and that this information was revealed as a result of the habeas proceeding in that matter, which took place well after petitioner's trial. Judge Cruikshank found "nothing in the record, nor in the evidence received in the evidentiary hearing of this matter, that would indicate that Mikles had given false testimony at petitioner's trial." Judge Cruikshank found that Platt had plausible reasons for not doubting the veracity of Mikles's information, and that the evidence adduced at petitioner's trial was "abundantly clear" in pointing to petitioner's guilt. Judge Cruikshank concluded that, as a result, Mikles's testimony was unnecessary to the presentation of the case against petitioner and, therefore, immaterial.

As a result of his findings and conclusions, Judge Cruikshank denied the relief requested by petitioner. [On June 3, 1999,] Petitioner . . . filed a [second] petition for writ of habeas corpus with this court, seeking reversal of his convictions and retrial or, if this court were to find egregious wrongdoing, dismissal of the indictment.

1    See Answer, Exh. 2. at 1-3, (In re Bernard Gordon, No. F0333331, 2002 WL 1163606 (Cal.
Ct. of App. June 3, 2002)).

2

3          On June 3, 2002, the California Court of Appeal, Fifth Appellate District (hereinafter "Fifth

4    DCA"), issued its decision denying Petitioner's June 3, 1999 petition.  See Answer, Exh. 2.

5    Petitioner filed a petition for review in the California Supreme Court on July 3, 2002.  See

6    Respondent ("Resp't") Lodged 118(a).  The California Supreme Court denied the petition on July 9,

7    2003.  See Resp't Lodged 118(d).

8                            **Federal Procedural History**

9          Petitioner filed the instant petition for writ of habeas corpus in the United States District

10   Court, Eastern District of California on March 1, 2004.  Respondent filed an answer on August 30,

11   2004.  On March 25, 2008, Petitioner filed a traverse.[3]

12         On March 27, 2008, the Court dismissed Petitioner's habeas petition for failing to address

13   standards applicable under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

14   See Doc. 85.  Petitioner appealed to the Ninth Circuit Court of Appeals which vacated the judgment

15   and remanded for consideration of the merits of Petitioner's claims on July 15, 2009.  See Doc. 94.

16                            **Factual Background**[4]

17         A.     The Week Before December 18, 1983

18              In December 1983, Lorrie Darrough (then Ashcraft) was a security officer at
the Kmart store on Pacific Avenue in Stockton.  Her duties included participation in
19   the cash pickup, in which two people from the store office and a security officer went
to each register at the front of the store and removed the cash.  After the money was
20   collected, it was counted and placed in a safe until it was collected by the Loomis
armored car driver.  The time of the Loomis pickup did not usually vary by more than
21   10 or 15 minutes.

22              Either Tuesday or Wednesday of the week before December 18, Darrough was
at the front of the store watching the cash pickup, when she saw two people who
23   seemed to be paying more attention to the pickup than anyone else.  Darrough was
probably near register five; one of the people was between registers one and five, and
24   the other was between registers five and ten.  The person between registers one and
five was male, about five feet ten inches tall and husky, with blondish hair and a

25

26              [3]Between September of 2004 and March of 2008,  Petitioner filed numerous motions to extend time to file his
traverse and other associated motions, however the Court's order of March 11, 2008 advised Petitioner that no further
27   extensions of time would be granted.  On March 25, 2008, Petitioner filed his traverse.

28              [4]The Court adopts the factual history as set forth in People v. Gordon Nos. F010369, F015109 , slip op. at 5 17 (Cal.
Ct. App., 5th Dist. June 11, 1992), See Resp't Lodged 111(a).

mustache; He appeared to have a two- to three-day growth of beard.  At trial, Darrough. identified him as defendant.  He was paying intent attention to the pickup--watching it the entire 10 or so minutes Darrough was at the front of the store--whereas most people paid attention only until they figured out what was happening.  The other person was a taller male--Darrough believed he was over six feet--with dark brown hair, a mustache, and glasses.  The men were watching Darrough and the cash pickup out of the corners of their eyes.  The man between registers five and ten was looking down at something in his hand.

After the pickup was completed, Darrough escorted the cash to the office.  When she returned to look for the two men, they were gone.  That afternoon or the next day, she told the security supervisor about the incident.  Darrough saw defendant again the next day.  He was standing by the shower curtains in the domestics department.  Although he was holding a shower curtain, he was looking toward the office.  Darrough walked past him, passing within three to four feet of him, and went to the cafeteria to telephone the office.  She wanted to tell them to be careful.  When she returned to the office about five minutes later, defendant was gone.  She notified her supervisor that day.

B.     The Robbery and Homicide

Between 3:30 and 4:00 on the afternoon of December 18, 1983, Rose Villaron was bound for the supermarket next to Kmart.  She parked facing the parking lot entryway that came off Pacific Avenue.

When she pulled up, Villaron noticed three men sitting in a car.  Although there was an empty space between that car and hers, Villaron was concerned because "it just didn't seem right for them to be where they were."  Villaron remembered the car as being big and an older model.  It was light beige.  It was not a station wagon.

The men were looking toward Pacific Avenue.  Villaron got the best look at the driver.  He was tall and wore a hat.  He had a mustache and glasses.  Villaron subsequently identified a photograph of Patrick as the person she believed was the driver of the car.  Villaron was unable to see the person next to him.  The man in the back seat appeared to have a husky build and dark complexion.

Villaron was in the supermarket for about 10 minutes.  When she returned to her car, the other vehicle was gone.  Villaron then went to her home, which was directly behind Kmart.  Her kitchen window overlooked carports, trees, an alley, and the back of the store.  After Villaron had been home a few minutes, she looked out of her kitchen window.  The car she had seen was parked "back there."

On December 18, Joyce Schultz was employed by Loomis Armored Incorporated as a driver-guard.  Her partner that day was William Camp Wiley.  They proceeded to various businesses to collect daily receipts, and reached the Kmart on Pacific Avenue around 4 p.m.  They came down Pacific Avenue and took the first driveway into the parking lot.  Schultz was driving, and she stopped the armored van at the store's front entrance.  She and Wiley rotated assignments; that day, it was Wiley's turn to be the "jumper" or custodian.  Wiley took the money bag, left the van, and went inside the store.  As the driver, Schultz did not get out of the van.  Instead, she watched Wiley walk down the aisle until he was out of her sight.  Wiley was armed with a .38 handgun, which, when he entered the store, was on his side in its holster.  Wiley never returned.

Once inside, Wiley picked up $70,000 to $80,000 cash from Kay Pacillas in

1   the store office.  When he left the office, his weapon was still holstered at his side.
    The cash was in a blue bank bag.  None of the cash consisted of rolls of money, gold
2   coins, or proof sets.

3       Heather Pierce and her mother, Sharon Ottilige. were shopping in Kmart.  As
    Pierce was walking between merchandise counters 17 and 19, she observed two men
4   standing on either side of the aisle between counters 17 and 19, or 16 and 18. [FN5]
    Pierce stopped and looked at the man on her left who was about five feet away.  He
5   was approximately six feet tall; the other man was two to four inches shorter.  The
    taller man was wearing dark clothing.
6

7       FN5.  The record of evidence includes People's exhibit 172, a diagram
        of the Kmart store.  The diagram shows merchandise shelves or
8       counters, which run east-west and are separated by aisles, located east
        of the office area.  Counter 1 is situated near the south end of a storage
9       area; south of it is the cafeteria.  Counter 15 is situated near the north
        of the office area; north of it is the television and appliance section of
10      the store.  There are also merchandise counters which run north-south,
        separated by aisles located between counters 1 through 15 and the front
11      of the store.  These counters run perpendicular to counters 1 through
        15, and are in pairs.  Counters 16 and 17 lie to the south, while
12      counters 22 and 23 lie to the north.  The aisle between counters 5 and 6
        is at least partially aligned with the aisle between counter pairs 16-17
13      and 18-19.

14          According to Stockton Police Officer Kurland, who prepared
        the initial small diagram that became exhibit 172, the east-west
15      merchandise counters are 30 feet long.  The aisles separating them are
        four feet six inches wide.  The east-west counters are separated from
16      the north-south counters by an aisle that is five feet two inches wide.
        The counters themselves are approximately five feet tall.

17      The man on Pierce's left frightened her, so she backed up a little bit, turned
    down another aisle, and headed north.  She was near counter 21 when she heard shots
18   fired somewhere behind her.  She grabbed the child she was baby-sitting and ducked
    for cover.  At five feet two inches tall, Pierce was unable to see over the merchandise
19   counters.  However, she heard four shots, the last of which was muffled.

20      At the time the shooting occurred, Ottilige was in the aisle between counters
    16 and 18, and 5 and 6.  Her attention was drawn by two men running past her toward
21   the back of the store.  They came from between counters 16 and 18 and ran down the
    aisle between counters 5 and 6.
22
        After the men passed her, Ottilige saw two people on the left-hand side of the
23   aisle, toward the back, come together as though they were fighting.  She turned away.
    A few seconds after the men ran past her, Ottilige heard four shots.  Two were very
24   close together, one followed shortly after, and the fourth--which was
    muffled--followed a lightly longer pause.  The men were directly in front of, and
25   about 10 feet away from, Ottilige now, and she saw the guard fall to the floor.  He fell
    out from behind the man who was standing with his back to Ottilige.  The men knelt
26   beside or bent over the guard.  One reached over, and Ottilige had the impression he
    was going for the guard's gun.  One of the men then left, rounding the corner to the
27   right of the aisle and heading right.  The other turned and faced Ottilige, who had
    ducked down behind her shopping cart, then backed out down the aisle.  As he did so,
28   he waved his gun back and forth.  He turned to the left at the rear of the aisle, then

crossed the aisle again and went right.  He was stooped over, and Ottilige saw him heading into the storage area in the back.

After the incident ended, Ottilige found Pierce and they went outside to their car.  Ottilige told Pierce she had seen everything and should go back in.  Pierce said she felt she (Pierce) should also go back in.  They then went inside and gave statements to the police.

According to Stockton police officer Peters, Pierce said she saw two individuals, standing on either side of the aisle.  The first was a white male, in his 30s, with a mustache, large build, camouflage shirt, and a dark blue baseball-type cap.  The second was a white male, 20 to 30 years old, with a green shirt or jacket.

Ottilige told Peters she was standing in the north-south aisle when she heard shots and saw the guard fall to the floor.  Standing in front of the guard was a white male, 25 to 30 years of age, 5 feet 10 inches to 6 feet tall, 160 pounds, with stiff blond hair.  He wore a green army jacket that was cinched at the waist, green army-surplus-type pants, and a green baseball-type hat.

This suspect ran to the back of the store with the gun in his hand.  Otiilige described it as a long-barreled handgun.  She said she heard three shots, then one shot that sounded different.

Denice Menking and her mother, Phyllis Menking, arrived at Kmart at about 3:45 p.m.  As Denice came around counter 20, she saw two men.  One, who was facing her, was standing by counter 16.  The other was standing by counter 18; his back was to her.  The man by counter 16 was wearing a camouflage army jacket, designer jeans, tennis shoes, and a baseball cap.  He was five feet nine inches to six feet one or two inches in height, and weighed one hundred eighty pounds or more.  He had neatly cut blond hair and a neatly trimmed mustache.  Denice did not believe he was wearing glasses.  The other man was wearing something like a yellow windbreaker that said "Marines" on the back in black writing.  This man was scruffier, shorter, and stockier than the other man.  Denice did not see his face.

As Denice walked from counter 20 to the aisle between counters 3 and 4, she continued to look at the two men.  When she reached approximately the beginning of counter 18, she thought the man facing her was Stockton police officer Gary Armstrong, a good friend of hers.  She watched the man for a minute or so and started to walk toward him, then veered off when she realized it was not Armstrong.  She was approximately five to twenty feet away when she discovered her mistake.  She continued to look at the man as she walked past him; at the closest point, she was approximately eight feet away.

As she passed the man, they made eye contact.  The man smiled; Denice returned the smile.  She is a dental assistant and noticed he had a very nice attractive smile.

As Denice reached the beginning of counter 4 , she saw the two men enter the aisle between counters 5 and 6.  They were moving at a fast pace.  Just as Denice turned into the aisle by counter 4, she heard four loud noises, like a gun going off, from between counters 5 and 6.  The sounds came from the area toward the opening of the aisle, near the main aisle which leads to the cafeteria.  The noises were one right after another; she did not discern a difference in sound.

Denice froze and stared at what was going on.  She saw the two men in the

aisle between counters 5 and 6. They both knelt down below the shelf casing, came back up, headed toward the back wall of the store, and then turned to the right, which was toward counters 7 and 8. Phyllis Menking was in the aisle between counters 8 and 18 when she heard someone shout "Hey" from the area of counters 16 and 18. She saw two men running. They were at the head of the aisle between counters 5 and 6, but not yet between those counters, when the first shot was fired. Phyllis saw one of the men pull the trigger. Just before the men stepped in between the counters, the same man pulled the trigger again. The man held the gun pointing straight out. His elbow was at his waist. Phyllis actually saw his finger on the trigger. She focused on the gun, but her attention did not remain there. She was more or less "looking him up and down," so that she would be able to identify him if she was asked to do so. She was frightened, but alert.

The gunman had blue eyes and a mustache. He was not wearing glasses. Phyllis had a three-quarter view of his face the entire time until he bent down and went out the back. All she could say about the other man was that he appeared to be "half a head" shorter, and heavier. She could not describe his clothing.

Phyllis heard the first shot, then saw the next two fired. She also heard a fourth shot, which closely followed the first three. The first three shots were fired by one gun, while the fourth shot came from another gun. It sounded muffled or like a pop.

After the second shot was fired, the men went into the aisle. One of them bent down as if he were picking something up. He then came back up, and the men went down the aisle between counters 5 and 6. They turned right at the corner of 6 and exited through the rear doors. Phyllis estimated that 20 seconds elapsed from the time she heard the shout to their exit. The closest she got to the person with the gun was approximately 30 feet.

Denice and Phyllis found each other about 45 seconds later. As they passed the area of the shooting, Phyllis saw a guard lying on the floor with towels or wash rags over his face. Denice suggested they leave the store. Both women were upset, and Denice wanted to get out of the store because the one man had seen her and she was afraid he would come looking for her. She and Phyllis went home, where they told Denice's father what they had seen. While Phyllis spoke with him, Denice returned to the car to get her Christmas presents. About five minutes later, her father called her back inside. He asked her what she had seen; when she told him, the three of them discussed it, then Mr. Menking telephoned the police.

The police asked Denice to describe the person she had seen. According to Denice, she described the man she thought was Gary Armstrong as being approximately five feet nine inches to six feet one inch in height, between one hundred eighty and two hundred pounds, and with blond hair. Phyllis testified she described the person she saw as being approximately six feet, to six feet one inch tall, with blond hair and a mustache. He wore a camouflage green army fatigue jacket, blue jeans, blue tennis shoes, a dark plaid shirt, and possibly a baseball cap.

Officer Peters interviewed Denice and Phyllis at the Menking home. Phyllis told him she was standing northeast of the aisle where the guard was. The man she saw shoot the guard was white, 25 to 32 years old, 130 pounds, with blond hair and broad shoulders, and wore a camouflage jacket and a baseball cap. The gun was similar to a .44 blue steel slide automatic with a long black barrel, and there were three to four shots.

Denice told Peters she passed two men who were standing at the head of an aisle, one on each side.  The one with his back to her was a white male, 25 to 32 years old, 6 feet tall, with thick, uncombed, dark hair.  The man was scruffy, and wore a yellow windbreaker-type jacket which had a circle on the back and the word "Marines" in black letters inside the circle.  The word went up in a curve and was followed by other words, which were covered because the suspect was leaning against a display shelf.  The man facing her was white, 25 to 32 years old, 6 feet 2 inches tall, 190 pounds, and nice-looking with a large build.  He had short blond hair, a blond mustache, and blue eyes.  He wore a baseball-type cap, designer jeans, plaid shirt, and a jacket.  As she walked past, he smiled at her and she smiled back.  Peters' report did not contain anything about Denice saying one suspect looked like someone she knew.

Kmart assistant manager Jim Putman was in the cafeteria around 4 p.m., when he heard three or four shots.  After he ran to the west end of counter 1, he saw a male backing out of the rear of an aisle roughly around counter 6 or 7.  The man, who was 40 to 50 feet from Putman, had a gun in one hand and looked directly at Putman.  He was six feet to six feet two inches tall, weighed two hundred twenty-five pounds, and had dirty blond hair.  A green stocking cap was pulled down to the top of his ears, and he wore a green army field jacket, jeans, and tennis shoes. His face was very red and acne-covered.

Dorothy Lewis was demonstrating appliances near the cafeteria at about 4 p.m., when she heard what she thought were firecrackers.  She ran toward the sound, then smelled gun smoke.  She stopped and looked down to the area from which the gunfire had come.  She saw two men approximately twenty feet from her.  The taller one was standing; he turned and faced her and then looked over his left shoulder at his partner, who was behind him.  The partner was bent over.  Lewis could only see the top of his head.

Lewis got a good look at the taller man.  He was about six feet or six feet two inches tall, of medium build, and possibly in his late twenties.  He had light brown hair and a mustache, and wore glasses.  He could not have been as tall as six feet four inches; Lewis saw the other man when the two men started to leave.  He was shorter  possibly five feet ten inches to six feet tall  and had a heavier build.  Both men were wearing bright red caps.  The taller man had on what Lewis thought was a blue denim jacket.  She was only able to see the men from about shoulders up.

When the police arrived a short time later, Lewis recounted her description to them.  According to Stockton Police Officer Schmit, Lewis told him she was approximately 50 feet from the scene of the crime and did not know anything was amiss until she heard the gunshots.  She saw the suspects in the area of the victim, then saw them running from that aisle to a point toward the west end of the building, and then running out north through the exit.  Lewis described the first suspect as a white male, approximately 23 to 27 years old, 5 feet 10 inches to 6 feet tall, 190 to 200 pounds, with blondish curly hair, and wearing a red cap and blue jacket.  She described the second suspect as a white male, approximately 21 t o 26 years old, around 5 feet 8 inches tall, with a medium build.  She did not notice anything about his clothing.

Loomis driver Schultz became aware that something had happened inside the store when she saw that people were moving differently than normal shoppers.  Within what seemed like a matter of minutes, someone from the store approached the van and said Schultz's man was down.  Wiley died from shock and hemorrhage due to multiple gunshot wounds.  In performing the autopsy, Dr. Lawrence found four gunshot wounds to the front of the body.  Three were distributed on a diagonal line

from Wiley's left shoulder to the right lower chest.  The fourth was in the pit of
Wiley's stomach.  Unlike the others, this was a contact wound:  the weapon was stuck
right into Wiley's abdomen and fired.  There were two exit wounds in the right back
area, and a third in the right side of the trunk.  One bullet lodged beneath the skin of
Wiley's back.  All four were fatal wounds.

See Resp't Lodged 111(a) at 5-17, (People v. Gordon Nos. F010369, F015109 , slip op. (Cal. Ct.
App., 5th Dist. June 11, 1992)).

**Discussion**

**I.      Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may file a petition for a writ of

habeas corpus in the United States district courts if the custody is in violation of the Constitution or

laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

Taylor, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition challenging a conviction

is proper in the judicial district in which the petitioner was convicted.  28 U.S.C. § 2241(d).

As Petitioner asserts that he is in custody pursuant to a State conviction which violated his

rights under the United States Constitution, the Court has jurisdiction over this action.  28 U.S.C. §

2254(a).  After a change in venue, Petitioner was convicted in Fresno County, California, which is

within the Eastern District of California, and thus venue is proper in the Eastern District.  28 U.S.C.

§ 84; 28 U.S.C. § 2241(d).

**II.     Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

enactment.  Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

(9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition

"may be granted only if [Petitioner] demonstrates that the state court decision denying relief was

'contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir.

2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall,

603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

1    Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

2    Petitioner's habeas petition as Petitioner is in the custody of the California Department of

3    Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

4    Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward,

5    603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

6    established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538

7    U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

8    law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

9    decisions as of the time of the relevant state-court decision."  Id. (quoting Williams, 529 U.S. at

10   412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

11   principle or principles set forth by the Supreme Court at the time the state court renders its decision."

12   Id.  Finally, this Court must consider whether the state court's decision was "contrary to, or involved

13   an unreasonable application of, clearly established Federal law."  Id. at 72 (quoting 28 U.S.C. §

14   2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

15   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

16   if the state court decides a case differently than [the] Court has on a set of materially

17   indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the

18   'unreasonable application clause,' a federal habeas court may grant the writ if the state court

19   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

20   that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal court may

21   not issue the writ simply because the court concludes in its independent judgment that the relevant

22   state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

23   application must also be unreasonable."  Id. at 411.  A federal habeas court making the

24   "unreasonable application" inquiry should ask whether the State court's application of clearly

25   established federal law was "objectively unreasonable."  Id. at 409.

26   Petitioner bears the burden of establishing that the state court's decision is contrary to or

27   involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

28   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

1   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

2   decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While

3   *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

4   need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v.

5   Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it

6   can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit

7   precedent on a federal Constitutional issue. . . .  This does not mean that Ninth Circuit case law is

8   never relevant to a habeas case after AEDPA.  Our cases may be persuasive authority for purposes of

9   determining whether a particular state court decision is an 'unreasonable application' of Supreme

10  Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the

11  AEDPA requires that the Court give considerable deference to state court decisions.  The state

12  court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is

13  bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

14  2002).

15      The initial step in applying AEDPA's standards is to "identify the state court decision that is

16  appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

17  than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

18  reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

19  that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

20  ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

21  state court decisions to the last reasoned decision to determine whether that decision was contrary to

22  or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

23  1112-13 (9th Cir. 2003).

24      In the instant petition, Petitioner raises three grounds for relief.  Petitioner raised all three

25  grounds on collateral review to the California Court of Appeal which denied Petitioner's claims in a

26

27

28

1  reasoned opinion.[6]  See Answer, Exh. 2.  Petitioner's claims were then raised in a petition for review

2  to the California Supreme Court, which summarily denied review.  See Resp't Lodged 118(d).  The

3  California Supreme Court, by its "silent order" denying review, is presumed to have denied the

4  claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker,

5  501 U.S. 797, 803 (1991).  For all three grounds, the California Court of Appeal was the last state

6  court to issue a reasoned opinion; thus, the Court analyzes whether the appellate court's decision is

7  an objectively unreasonable application of federal law.

8  **III.    Review of Petitioner's Claims**

9  Petitioner's Ground One asserts that the Prosecutor failed to disclose, prior to trial, numerous

10  favorable impeaching facts bearing on the credibility of the state's informant witness which violated

11  Petitioner's rights provided under the United States Constitution.  See Petition at 32.  Petitioner's

12  Ground Two contends the Prosecutor knowingly presented false testimony provided by its informant

13  and additionally failed to correct the alleged falsehoods in violation of Petitioner's Constitutional

14  rights.  See Petition at 223.  In Ground Three, Petitioner contends the combined error resulting from

15  the Prosecutor's failure to disclose and presentation of false testimony requires reversal of

16  Petitioner's conviction.  See Petition at 263-64.

17  **A.    Ground One:  The Prosecutor's Failed Disclosures**

18  Petitioner alleges that the government failed to turn over exculpatory information bearing on

19  a jailhouse informant's (Mark Mikles) credibility including information that generally falls into the

20  following three categories:  (1) the informant's history in testifying as a witness in other cases; (2)

21  prior government investigations involving the informant's testimony and consideration received for

22  that testimony; and (3) prior cases where the informant's testimony was found to be either unreliable

23

24

25

26  [6] As discussed above, the Fifth DCA's original 1992 opinion both:  (1) consolidated Petitioner's direct appeal and
initial habeas petition; and (2) affirmed the judgement but directed the trial court to hold an evidentiary hearing.  See Resp't
27  Lodged 111(a) (People v. Gordon Nos. F010369, F015109 , slip op. (Cal. Ct. App., 5th Dist. June 11, 1992)).  Following
this evidentiary hearing, Petitioner filed a second habeas petition with the Fifth DCA, and the Court of Appeals issued its
28  reasoned opinion on June 3, 2002 denying Petitioner's claim.  See Answer, Exh. 2, (In re Bernard Gordon, No. F0333331,
2002 WL 1163606 (Cal. Ct. of App. June 3, 2002)).

1   or false.[7]  See Petition at 36-219.  Petitioner alleges violations of the Fifth, Sixth, and Fourteenth

2   Amendments as a result of the Prosecutor's suppression of material evicence in violation of Brady v.

3   Maryland, 373 U.S. 83 (1963).[8]

4           The California Court of Appeals addressed Petitioner claim as follows:

5           It is settled that suppression of evidence, even when unintentional or
        inadvertent, violates due process.  (Brady v. Maryland (1963) 373 U.S. 83, 87, 83
6       S.Ct. 1194, 10 L.Ed.2d 215; People v. Pensinger (1991) 52 Cal.3d 1210, 1272, 278
        Cal.Rptr. 640, 805 P.2d 899.)  This rule extends to the disclosure of evidence relating
7       to the credibility of witnesses, including any inducements made to secure the
        witnesses' testimony.  (Giglio v. United States (1972) 405 U.S. 150, 154, 92 S.Ct.
8       763, 31 L.Ed.2d 104; People v. Pensinger, supra, 52 Cal.3d at p. 1272, 278 Cal.Rptr.
        640, 805 P.2d 899; People v. Phillips (1985) 41 Cal.3d 29, 46, 222 Cal.Rptr. 127, 711
9       P.2d 423.)

10          . . .

11          It is apparent that certain information was not disclosed prior to petitioner's
        trial, and that at least some of this information would have been favorable to the
12      defense in the sense that it could have been used to impeach Mikles's credibility.  In
        this regard, respondent vociferously argues that any nondisclosure cannot be charged
13      to "the prosecution" in this case, because San Joaquin County authorities turned over
        to the defense everything they possessed, and Los Angeles County, City of Long
14      Beach, State of California, and other non-San Joaquin County agencies were not part
        of the "prosecution team"; moreover, the defense could have obtained some of the
15      information on its own.

16          . . .

17          Petitioner urges us to impute knowledge of the Los Angeles and other
        information to the San Joaquin County prosecutor.  We need not decide whether that
18      is required under the authorities cited above, since there is an additional wrinkle in
        this case: prior to petitioner's trial, discovery orders were directed to the various
19      authorities and agencies outside San Joaquin County in question here.  None of those
        agencies objected to or challenged those orders, which were unopposed by the San
20      Joaquin County District Attorney's Office, and at no time has respondent claimed the
        San Joaquin County Superior Court lacked jurisdiction to issue them.  As Judge
21      Cruikshank found, those orders were violated-indeed, they appear to have been

22  _____

23          [7]Similar to his Petition filed with the California Court of Appeals, Petitioner devotes nearly 200 pages of his Petition
    in setting forth his alleged discovery violations all which relate to Mr. Mikles' credibility.  As we set forth below, because
24  we find the overwhelming evidence of guilt adduced at trial results in Petitioner's failure to demonstrate prejudice, we need
    not address each of Petitioner's separate allegations of failed disclosure.

25          [8]The Supreme Court has never squarely held that the Sixth Amendment Compulsory Process Clause requires the
26  government to produce exculpatory evidence.  Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987).  Instead, the Supreme Court
    traditionally has evaluated exculpatory evidence claims under the broader protections of the Due Process Clause of the
27  Fourteenth Amendment.  See United States v. Bagley, 473 U.S. 667 (1985); Brady v. Maryland, 373 U.S. 83 (1963).  Thus
    while it is unclear whether withholding exculpatory evidence violates the Sixth Amendment, it is well settled that the
28  government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt
    or punishment.  Brady v. Maryland, 373 U.S. at 86 87.

completely ignored.  Thus, whether we say the San Joaquin County District Attorney's Office is charged with knowledge of information in the hands of the various other authorities and, hence, had a duty to disclose that knowledge, or whether we place the blame on those other authorities, the fact remains that petitioner did not receive all of the information to which he was entitled.

Since "'due process concerns itself with the fairness of the trial as a whole' [citations]," "[n]ot every discovery violation is a due process violation-only those that undermine confidence in the outcome." (*People v. Ochoa* (1998) 19 Cal.4th 353, 474, 79 Cal.Rptr.2d 408, 966 P.2d 442.) Accordingly, we must determine whether the undisclosed information was material, i.e., whether there was a reasonably probability-one sufficient to undermine confidence in the outcome-that, had disclosure occurred, the result would have been different.

See Answer, Exh. 2 at 5-10.

The Fifth DCA's opinion also noted four aspects of a proper Brady analysis suggested by the United States Supreme Court's guidance in Kyles v. Whitley, 514 U.S. 419 (1995).  First the Court of Appeal quoted Kyle for the proposition that  ". . . a showing of materiality does not require demonstration by a preponderance that disclosure . . . would have resulted ultimately in the defendant's acquittal . . . ."  See Answer Exh. 2 at 10. (quoting Kyles v. Whitley, supra, 514 U.S. at 434-435).[9]  Next, the Court of Appeal recognized Kyle's cautionary guidance that determining "Bagley materiality" was "not a sufficiency of evidence test" but rather whether "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  See Answer Exh. 2 at 10 (quoting Kyles v. Whitley, supra, 514 U.S. at 434-435). The Court of Appeals also noted the Supreme Court's instruction that once a constitutional error was found that "further harmless-error review was unnecessary and that a proper evaluation of the materiality of the undisclosed evidence required an collective assessment of its 'cumulative effects.'" See Answer Exh. 2 at 10 (quoting Kyles v. Whitley, supra, 514 U.S. at 434-435).

Applying these principles the Fifth DCA's opinion then stated:

We have examined the undisclosed evidence, both item by item and in its cumulative effect, and find it was not material.  "'The mere possibility that an item of

[9]The Fifth DCA also quoted the Kyles Court further explanation regarding materiality: "Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  See Answer Exh. 2 at 10 (quoting Kyles v. Whitley, supra, 514 U.S. at 434).

undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 829, 9 Cal.Rptr.2d 24, 831 P.2d 249.)  Thus, "[i]n general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' [citation], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citation].  In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony,' [citation], or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable [citations]." (*U.S. v. Payne, supra*, 63 F.3d at p. 1210; accord, *U.S. v. Amiel* (2d Cir.1996) 95 F.3d 135, 144.)

Despite petitioner's argument to the contrary, we conclude the undisclosed information would have been cumulative to the strong, extensive impeachment evidence presented at petitioner's trial.  (See, e.g. *People v. Hayes, supra*, 52 Cal.3d at p. 612, 276 Cal.Rptr. 874, 802 P.2d 376.)  The jury was apprised of Mikles's criminal background and the fact he had previously testified in a number of cases, most of which were homicides.  The information presented to the jury clearly showed that Mikles did not inform simply out of the goodness of his heart, but that he expected to receive something in return.  The jury was also apprised, through the letters Mikles wrote to Detective Rosenquist, that Mikles was not above threatening noncooperation if he felt slighted, and that he would attempt to manipulate circumstances to his advantage.  The timing of Mikles's coming forward-some two years after he received the information from petitioner-was also revealed to the jury. (See *In re Malone* (1996) 12 Cal.4th 935, 961, 50 Cal.Rptr.2d 281, 911 P.2d 468.)  In addition, Mikles himself admitted that he was not always truthful.

Mikles's involvement in the Los Angeles County jail informant scandal was not revealed to the jury.  Nevertheless, there is no reasonable probability that information would have changed the outcome, since there was no evidence Mikles was involved in fabricating confessions. (See *People v. Gonzalez, supra*, 51 Cal.3d at p. 1259, 275 Cal.Rptr. 729, 800 P.2d 1159.)  His involvement, as shown by the grand jury report, was in terms of not revealing the compensation he was to receive for his testimony.  It would be speculative to assume, based on the information which is now before us, that Mikles was also involved in schemes to fabricate testimony and, more importantly, there is absolutely nothing to suggest that the type of system and abuses which existed in the Los Angeles County jail also existed in the San Joaquin County jail.

Petitioner contends the prosecution violated its posttrial duty to disclose information, such as a letter Platt wrote in 1990, at Mikles's request after Mikles had reoffended, verifying that Mikles testified in petitioner's case.  We are not convinced that duty was violated in the instant case; "after a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." (*Imbler v.. Pachtman* (1976) 424 U.S. 409, 427, fn. 25, 96 S.Ct. 984, 47 L.Ed.2d 128, italics added; see also *People v. Gonzalez*, supra, 51 Cal.3d at p. 1261, 275 Cal.Rptr. 729, 800 P.2d 1159; *People v.. Garcia* (1993) 17 Cal.App.4th 1169, 1179, 22 Cal.Rptr.2d 545.)  That standard is not met here.  [[FN10]]  Moreover, it is difficult to see how there could be a *Brady* violation with respect to information which did not exist at the time of petitioner's trial.  (See *In re Williams, supra*, 7 Cal.4th at p. 611, 29 Cal.Rptr.2d 64, 870 P.2d 1072.)

FN10.  For instance, it has been held that a court cannot conclude an agreement to compensate an informant for testimony existed merely because of a subsequent disposition of criminal charges against the witness.  (*McCleskey v. Kemp* (11th Cir.1985) 753 F.2d 877, 884.)

In any event, we are convinced that, had everything presented to Judge Cruikshank and to us been disclosed to the defense and, by extension, revealed to petitioner's jury, there is no reasonable probability the result would have been different.  Mikles was not the key witness petitioner would have us conclude.  (Contrast  *In re Pratt* (1999) 69 Cal.App.4th 1294, 1304, 1307, 82 Cal.Rptr.2d 260 [key witness testified at trial that he was not working for law enforcement; information subsequently came to light regarding his close relationship with law enforcement authorities and his motive to curry favor with same]; *Carriger v. Stewart* (9th Cir.1997) 132 F.3d 463, 480 [informant was state's only direct witness; basic issue for jury was whether informant was telling the truth when he blamed crimes on defendant].)  He was rigorously and thoroughly impeached, and his motives for testifying exposed.  (Contrast *In re Pratt*, *supra*, 69 Cal.App.4th at p. 1317, 82 Cal.Rptr.2d 260 [if disclosed, information would have presented "'potentially devastating cross-examination or other impeachment evidence regarding [the witness] in important respects'"]; *Singh v. Prunty* (9th Cir. 1998) 142 F.3d 1157, 1163 [prosecutor conceded disclosure that witness was receiving benefits for testimony might have been "'kiss of death'" to state's case].)  There was overwhelmingly strong eyewitness identification of petitioner.[FN11]  In addition, jail personnel intercepted and deciphered inculpatory notes which were passed between petitioner and his brothers.

FN11.  Significantly, Denice Menking even distinguished between petitioner, whom she testified smiled at her inside the Kmart prior to the shooting, and Patrick, based on so detailed a point as the fact Patrick had a visible diastema (space between his teeth), whereas there were no defects in petitioner's smile.  This point stood out in Ms. Menking's mind because of her profession as a dental assistant.

In *In re Pratt*, *supra*, 69 Cal.App.4th at page 1319, 82 Cal.Rptr.2d 260, the Court of Appeal declared itself "unable to express confidence in a guilty verdict based solely on evidence unconnected to [the witness in question]."  By contrast, we conclude that the undisclosed information in the present case does not undermine our confidence in the outcome of the trial. In light of the extensive impeachment of Mikles and the numerous other differences between the trials, which were explored at length during the evidentiary hearing before Judge Cruikshank, the fact petitioner's first jury deadlocked in favor of acquittal does not change our conclusion.  (See *People v. Marshall* (1996) 13 Cal.4th 799, 842, fn. 7, 55 Cal.Rptr.2d 347, 919 P.2d 1280.)

See Answer Exh. 2 at 5-10 (some footnotes omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  Brady and its progeny require a criminal defendant to prove three elements in order to show a Brady violation. Benn v. Lambert, 283 F.3d 1040, 1052 (9th Cir. 2002).  First, the suppressed evidence

must be exculpatory or impeachment material favorable to the defendant. Id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985)).  Second, the evidence must have been suppressed by the State, either willfully or inadvertently-thus requiring the defendant to establish that the prosecution knew or should have known during the proceedings of the evidence's existence and that the defendant did not possess the evidence, nor could he have obtained it with reasonable diligence.  See United States v. Agurs, 427 U.S. 97, 110 (1976); see also U.S. v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991); U.S. v. Dupuy, 760 F.2d 1492, 1502 n. 5 (9th Cir. 1985).  Third, a defendant must establish that prejudice resulted from the failure to disclose the evidence as "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  Bagley, 473 U.S. at 678.  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different [citation omitted]."  Id. at 682.  In determining materiality, "[t]he reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."  Bagley, 473 U.S. at 683.

As correctly assessed by the Court of Appeal, whether the blame for the failure to disclose was placed on the Prosecutor or other state authorities, "the fact remains that petitioner did not receive all of the information to which he was entitled."  See Answer Exh. 2 at 9.  Additionally, the Undersigned agrees with the Court of Appeal, that at least some of this information would have been favorable to Petitioner in that the undisclosed information could have been utilized to further impeach the informant's credibility.  Id. at 6.  Accordingly, Petitioner appears to have satisfied the first two elements of the proscribed analysis.  However, in light of the overwhelming evidence adduced at trial, Petitioner has failed to demonstrate the required prejudice from any failed disclosure sufficient to "undermine confidence in the outcome."  United States v. Bagley (1985) 473 U.S. at 678.

Based on a thorough review of the record, the Court agrees with Fifth DCA's finding that "there was overwhelmingly strong eyewitness identification of petitioner."  See Answer Exh. 2 at 12.

More specifically, four separate eyewitnesses positively identified Petitioner inside the store at the time of the murder and one of these identified Petitioner as one of the shooters.  First, Heather Pierce testified that she was shopping at the Kmart store when she observed Petitioner inside the store prior to hearing the shots.  See RT at 3351-53.  Next, Denice Menking, who was shopping in the store with her mother, Phyllis Menking, testified that she first heard shots fired inside the store and then moments later observed two men kneeling down near the area where the shooting occurred and then come back up and proceed toward the rear of the store.  See RT 3452, 3461-62.  As noted in the Fifth DCA's opinion, Denice Menking, a Dental Assistant, had been able to distinguish between Petitioner and his brother Patrick as Patrick had a noticeable space between his teeth and Petitioner's smile did not share this defect.  See RT 3452, 3475-76.

In addition to her daughter's testimony, Phyllis Menking testified that she observed Petitioner pull the trigger on a weapon and testified that she was certain regarding her identification.  See RT 3558, 3561, 3599-3600.  Finally, Dorothy Lewis testified that after hearing gun shots, she ran towards the gun shot sounds and stated that she "got a good look" at Petitioner.  See RT 3620-23, 3633.  Ms. Lewis was able to positively identify Petitioner as the individual she had seen near the crime scene.  See RT 3620-23, 3633.

In addition to the eyewitness testimony, the Court of Appeals noted that "jail personnel intercepted and deciphered inculpatory notes which were passed between petitioner and his brothers."  See Answer Exh. 2 at 12; See RT at 3977-80.  However, other physical evidence was also presented at trial.  Significantly, weapons experts determined the nine-millimeter casings recovered at the Kmart store following the shooting were fired from the Browning nine-millimeter pistol recovered from Petitioner's residence.  See RT 3714, 3768, 3869.  In addition, witnesses described Petitioner as wearing a green camouflaged jacket at the time of the robbery and a green camouflaged jacket was discovered during a search of Petitioner's brother's garage.  See RT at 3561, 4731.  Finally two city maps (of Tucson and Phoeniz, Arizona) were discovered during searches accomplished of both Petitioner's and his brother's residences.  See RT at 3771-72, 3215-16, 4876.  Law enforcement identified both Petitioner's and his brother's fingerprints on the Tucson map.  See RT at 3810-12, 3828.  Various locations were circled on the Tucson map and the letter "K" was

handwritten inside these circles.  See RT at 4876.  Investigators subsequently discovered either a

Kmart or Target store located at each of the locations identified by the circles.  See RT at 4876.  The

second map of Phoenix was discovered in the briefcase found at Petitioner's residence and both

Petitioner's and his brother's finger prints were also found on this map.  See RT at 3813.  Once again

the Phoenix map had various locations identified by a circle with the letter "K" in the middle and

detectives again confirmed that either a Kmart or a Circle K store was located at almost every

location.  See RT at 4181-4182.

    In light of the evidence presented at trial, the undisclosed impeachment evidence was not

material because the reliability of the informant's testimony was "not determinative of the

defendant's guilt or innocence."  United States v. Bracy, 67 F.3d 1421, 1428 (9th Cir. 1995); see

United States v. Agurs, supra, 427 U.S. at 112 (stating "[i]f there is no reasonable doubt about guilt

whether or not the additional evince is considered, there is no justification for a new trial.");  see also

United States v. Service Deli Inc. 151 F.3d 938 (9th Cir. 1998) (noting where ". . . the evidence of

guilt was otherwise overwhelming, withholding of impeachment material might not . . . affect[ ] the

trial's outcome").  Accordingly, the Undersigned agrees with the Court of Appeal's assessment that

"had everything presented to Judge Cruikshank and to us been disclosed to the defense and, by

extension, revealed to petitioner's jury, there is no reasonable probability the result would have been

different."  See Answer Exh. 2 at 12.  Petitioner is not entitled to habeas corpus relief on this ground.

## B.    Ground Two:  Prosecution's Presentation of False Evidence

    In Ground Two, Petitioner claims that the prosecution knowingly presented false testimony

provided by the state's informant witness, Mr. Mikles, and failed to disclose and correct the alleged

falsehoods.  Petitioner contends that the state failures in this regard violated Petitioner's rights

afforded under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[12]

---

[12]It is well "established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Napue v. Illinois, 360 U.S. 264, 269 (1959). Petitioner also alleges that his Sixth Amendment right to confrontation was violated by the Prosecutor's knowing use of false testimony.  See Petition at 226.  As a threshold matter, the Court notes that it finds no United States Supreme Court authority in support of Petitioner's Sixth Amendment contentions.  However, even presuming the existence of such authority, because the Court agrees with the state court's finding that Mikles did not provide false testimony at trial, it additionally rejects Petitioner's claim that his Sixth Amendment rights were violated.

1    Petitioner alleged at least seventeen separate instances of false testimony including Petitioner's

2    allegation that the informant's testimony regarding Petitioner's confession was false.[13]

3         The California Court of Appeal addressed Petitioner's claim as follows:

4         Petitioner next contends Mikles testified falsely at trial and the prosecution
     failed to disclose and correct the falsehoods.  In this regard, "[i]t is settled that due
5    process proscribes a criminal conviction obtained through perjured testimony
     knowingly used by the prosecution against the accused.  (*Pyle v. Kansas* (1942) 317
6    U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214; *Mooney v. Holohan* (1935) 294 U.S. 103,
     112, 55 S.Ct. 340, 79 L.Ed. 791.)  In fact, outright falsity need not be shown if the
7    testimony taken as a whole gave the jury a false impression.  (*Alcorta v. Texas* (1957)
     355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9.)  Thus, a denial of due process can result
8    if the prosecution, although not soliciting false evidence, allows a misleading and
     false impression to go uncorrected when it appears; it matters little that the false
9    impression goes only to the credibility of a prosecution witness or that the
     prosecutor's silence was not the result of guile or a desire to prejudice.  (*Napue v.*
10   *Illinois* (1959) 360 U.S. 264, 269-270, 79 S.Ct. 1173, 3 L.Ed.2d 1217.)" (*People v.*
     *Westmoreland* (1976) 58 Cal.App.3d 32, 42, 129 Cal.Rptr. 554, parallel citations
11   omitted.) . . . .

12        . . . 'In *United States v. Agurs*, *supra*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d
     342, the United States Supreme Court explained that when the prosecution fails to
13   correct testimony of a prosecution witness which it knows or should know is false and
     misleading, reversal is required 'if there is any reasonable likelihood that the false
14   testimony could have affected the judgment of the jury.'

15   <u>See</u> Answer Exh. 2 at 13 (citations omitted).

16   _____

17   [13] Petitioner's separate incidents involving Mikles' alleged false testimony include:  (1) his false pre trial testimony
     which overstated his "experience, reliability, credibility, importance, etc."; (2) Mikles' false pre trial and trial testimony that
18   Petitioner had confessed; (3) Mikles' false pre trial testimony that he had worked with Los Angeles Sherriff's Department's
     Sgt Shea on a prior drug related case; (4) Mikles' false pre trial testimony that he had agreed to "set up" two other defendants
19   by buying drugs and weapons; (5) Mikles' false pre trial testimony that he had worked with law enforcement regarding his
     involvement in selling drugs for the Mexican Mafia; (6) Mikles' false pre trial and trial testimony that he was in custody from
20   1977 through 1980; (7) Mikles' false pre trial and trial testimony regarding his compensation for testifying in both
     Petitioner's trial and the 1978 <u>Jackson</u> Trial; (8) Mikles' concealment (at both pre trial hearing and trial) regarding a "secret"
21   twenty six day vacation and other compensation negotiated for his <u>Jackson</u> Trial testimony; (9) Mikles' false pre trial
     testimony that he received no compensation for acting as an agent for the state in a previous drug sale; (10) Mikles' false pre
22   trial and trial testimony regarding his providing information about the Kikume Madden case to agent Don Hill and his
     testimony that Hill promised he could secure Mikles' early release from the Parole Commission; (11) Mikles' false pre trial
23   testimony that he had been working with Agent Morris on a Sierra State Prison Homicide; (12) Mikles' false pre trial and
     trial testimony  that he provided information to Hill to secure his wife's early release; (13) Mikles' false pre trial and trial
24   testimony that he "accidentally" brought up Petitioner's name while speaking with law enforcement; (14) Mikles' false pre
     trial testimony regarding consideration for giving information to Officer Little at the Honor Farm; (15) Mikles' false pre trial
25   and trial testimony regarding the spelling of his name; (16) Mikles' false trial testimony that he was release fifteen days early
     in exchange for his testimony at trial; (17) Mikles' false pre trial and trial testimony that he was honest and truthful.  <u>See</u>
26   Petition at  231 248.
          Petitioner additionally argues Mikles provided false testimony in the 1996 habeas evidentiary hearing which further
27   supported, according to Petitioner, that Mikles could not be trusted.  <u>See</u> Petition at 230 231.  However, in light of the Court's
     analysis which first assumes arguendo Mikles provided the false testimony but then concludes that overwhelming evidence
28   of Petitioner's guilt leaves the Court's confidence in the jury's verdict undisturbed, Petitioner's additional allegations here
     are of little import.

1    The Court of Appeal also recognized that to obtain relief for this claim the Petitioner must

2  show the introduced false evidence was material defined as:

3         . . . a 'reasonable probability' that, had it not been introduced, the result would have
          been different.  The requisite 'reasonable probability,' we believe, is such as
4         undermines the reviewing court's confidence in the outcome.  (Cf. *United States v.*
          *Bagley*, *supra*, 473 U.S. at p. 678 . . . .

5  See Answer Exh. 2 at 14.

6         After reviewing the applicable law, the Court of Appeals then stated:

7
8         Assuming Mikles testified falsely, and assuming the prosecutor knew or should have
          known of that fact and, hence, failed to correct that testimony, we find no reasonable
9         likelihood the false testimony could have affected the judgment of the jury, and no reasonable
          probability that, had the testimony not been introduced, the result of the trial would have been
10        different.  As previously noted, Mikles was rigorously and thoroughly impeached, and his
          motives for testifying shown to be less than altruistic.  His attempt to extort further benefits
11        from Rosenquist was also aired before the jury.  Additional or different evidence concerning
          compensation and benefits would have been cumulative since, regardless of the details, the
12        jury could not have failed to grasp that Mikles was in frequent trouble with the law and came
          forward with information when he thought he could gain something by doing so, thereby
13        making his credibility suspect.  (See *People v. Padilla* (1995) 11 Cal.4th 891, 931, 47
          Cal.Rptr.2d 426, 906 P.2d 388, overruled on other grounds in *People v. Hill* (1998) 17
14        Cal.4th 800, 823, fn. 1, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

15        We recognize the California Supreme Court has held that Mikles testified falsely
          about inducements offered to him for his testimony in *People v. Jackson*, supra, 28 Cal.3d
16        264, 168 Cal.Rptr. 603, 618 P.2d 149. (*In re Jackson*, *supra*, 3 Cal.4th at pp. 589-596, 11
          Cal.Rptr.2d 531, 835 P.2d 371; see *id.* at p. 618, 11 Cal.Rptr.2d 531, 835 P.2d 371 (dis. opn.
17        of Mosk, J. [record on issue of Mikles's perjury "verges on the overwhelming"].)  In the
          *Jackson* trial, however, Mikles unequivocally testified that he received nothing but "'a lot of
18        protection'" in exchange for his information. (*In re Jackson*, *supra*, 3 Cal.4th at pp. 589-591,
          11 Cal.Rptr.2d 531, 835 P.2d 371.)  Here, by contrast, it was made clear to petitioner's jury
19        that Mikles had testified in a number of cases and had received benefits of one sort or
          another, including modification of a state prison sentence, in return for his information.

20        In light of the record as a whole, false testimony concerning inducements does not
          lead us to the conclusion that Mikles may have fabricated petitioner's confession.  In *In re*
21        *Malone*, *supra*, 12 Cal.4th at pages 959-961, 50 Cal.Rptr.2d 281, 911 P.2d 468, for example,
          the California Supreme Court found significant "evidence showing a pattern of false
22        informing and fabrication of confessions."  Such evidence did not exist in the present case,
          either as to Mikles personally or, as we have discussed, with respect to admissions and
23        confessions obtained by San Joaquin County jail inmates.  However, even assuming that, had
          petitioner's jury known of Mikles's false testimony in *Jackson*, it would have inferred he was
24        fabricating petitioner's admissions to him, we find no cause for reversal of petitioner's
          conviction.  The mere fact that testimony of assertedly questionable credibility concerns an
25        alleged confession does not, without more, establish constitutional error. (See *In re*
          *Sassounian*, *supra*, 9 Cal.4th at pp. 547-548, 37 Cal.Rptr.2d 446, 887 P.2d 527.)  Here, as
26        discussed, Mikles was subjected to extensive impeachment, and there was overwhelming
          evidence of petitioner's participation in, and culpability for, robbery and murder in the course
27        of that robbery.  Under these circumstances, our confidence in the outcome of petitioner's
          trial is not undermined, and it is not reasonably likely the judgment of the jury was affected.

28

1   See Answer Exh. 2 at 14-15 (citations and footnotes omitted).[14]

2       The knowing use of false or perjured testimony against a defendant to obtain a conviction is

3   unconstitutional.  Napue v. Illinois, 360 U.S. 264(1959).  Petitioner bears the burden of "alleg[ing]

4   facts showing that there was knowing use of the perjured testimony by the prosecution."  Pavao v.

5   Cardwell, 583 F.2d 1075, 1076  1077 (9th Cir. 1978).  In the context of the presentation of false

6   evidence, Petitioner must prove all of the following: "(1) the testimony (or evidence) was actually

7   false, (2) the prosecution knew or should have known that the testimony was actually false, and (3)

8   that the false testimony was material."  United States v. Zuno Arce, 339 F.3d 886, 889 (citing

9   Napue, 360 U.S. at 269  271.)  Under Napue, false testimony is material, and therefore prejudicial, if

10  there is "any reasonable likelihood that the false testimony could have affected the judgment of the

11  jury."  Hayes, 399 F.3d at 984 (internal citation omitted).

12      The fact that there may be inconsistencies in certain witnesses statements and other conflicts

13  in the evidence do not establish that the prosecution presented false testimony.  See United States v.

14  Zuno Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (inconsistencies between testimony at trial and

15  retrial did not amount to presentation of false testimony); see also United States v. Croft, 124 F.3d

16  1109, 1119 (9th Cir. 1997) ("that a witness may have made an earlier inconsistent statement, or that

17  other witnesses have conflicting recollection of events, does not establish that the testimony offered

18  at trial was false").  Mere speculation regarding these factors is insufficient to meet the petitioner's

19  burden.  United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

20

21

22  [14]As the Court of Appeals noted, the California Supreme Court had previously held that Mikles had testified falsely
23  in Jackson.  See Answer Exh. 2 at 14.  The Ninth Circuit has subsequently reviewed Jackson's federal habeas petition and
    agreed with both the district court and the California Supreme Court findings that that "the prosecution had suppressed
24  information favorable to the defense in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963)
    and knowingly failed to correct false testimony in violation of Napue v. Illinois, 360 U.S. 264, 79 s.Ct. 1173, 3 L.Ed.2d 1217
25  (1959)" and also found the Napue violation material. Jackson v. Brown, 513 F.3d 1057, 1070, 1077 79 (2008).  Additionally
    the Ninth Circuit in Jackson held the Mikles' testimony was material to the jury's special circumstance finding that Jackson
26  had "acted 'with the intent to cause death'" resulting in his sentence of death.  Id. at 1077 78.  However, the Court agrees
    with the Court of Appeal's analysis which found that the facts of Jackson and the facts of the instant case are distinguishable.
27  See Answer Exh. 2 at 15.  In addition to those factual distinctions suggested by the Court of Appeal, in Jackson, the
    informants' testimony was found crucial to the jury's finding of intent however, in the instant case, unlike in Jackson, there
28  was other substantial evidence adduced at trial supporting the jury's finding.  See Section III A's further discussion of both
    eye witness testimony and physical evidence adduced at trial.

1         Here, Petitioner's claims fail for at least two reasons.  First, Petitioner failed to demonstrate

2   that Mikles' testimony was, in fact, false.  As Judge Cruikshank's February 23, 1999 final findings

3   stated:

4         . . . Mikles admitted having lied at the trial of Earl Lloyd Jackson, and this
         information was revealed as a result of the habeas proceeding in that matter, . . .

5         [however] Judge Cruikshank found "nothing in the record, nor in the evidence
         received in the evidentiary hearing of the matter, that would indicatet that Mikles had

6         given false testimony at petitioner's trial.

7   See Answer Exh. 2 at 3.  Additionally, as noted by the Court of Appeal, evidence that Mikles had

8   fabricated Petitioner's confession did not exist in this case.  Id. at 15.  Pursuant to the Antiterrorism

9   and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be

10  correct unless Petitioner rebuts the presumption with clear and convincing evidence.  28 U.S.C. §

11  2254(e)(1); see Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Moses v. Payne, 555 F.3d

12  742, 746, n.1 (9th Cir. 2009); Hall v. Director of Corrections, 343 F.3d 976, 983 (2003) (stating that

13  reviewing courts are to afford "great weight" to state habeas trial judge findings).  Here, the crux of

14  Petitioner's allegations, is that Mikles fabricated Petitioner's confession because, as Petitioner

15  argues:  (1) Mikles' late disclosure of the admission supports a finding that the testimony was false;

16  and (2) Mikles' false testimony about the inducements Mikles received in exchange for his testimony

17  provided in the earlier Jackson trial, also indicates that Mikles' testimony was fabricated; and (3)

18  other numerous examples provided by Petitioner regarding inconsistencies in Mikles' testimony

19  indicate Mikles' testimony lacked reliability.  However, Petitioner's suggestions do not support his

20  contention that Mikles provided false testimony at Petitioner's trial.  If an assertion that testimony

21  was perjured rests on "mere speculation," it is insufficient to establish a claim under Napue.  United

22  States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).  In addition, it is well established that the mere

23  fact that there are contradictions in testimony does not rise to the level of a due process violation.

24  United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) ( fact that a witness makes inconsistent

25  statements, or that other evidence conflicts with a witness's testimony, does not alone establish that

26  the witness offered false evidence); see also United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir.

27  2003) (rejecting Napue claim where petitioner failed to demonstrate testimony at trial was "actually

28  false"); see also Lambert v. Blackwell, 387 F.3d 210, 249, 252 (3rd Cir. 2004) (discrepancies in

1   testimony do not mean testimony is perjured).  It is the sole province of the jury to evaluate the

2   evidence presented and determine the truthfulness of the testimony presented.  United States v.

3   Hubbard, 96 F.3d 1223, 1226 (9th Cir. 1996); United States v. Goode, 814 F.2d 1353, 1355 (9th Cir.

4   1987).

5        Second, even assuming:  (1) Mikles testified falsely (ie. each incident of false testimony

6   alleged by Petitioner is true); and (2) the Prosecutor's disclosure of the alleged false testimony had

7   led the jury to infer that Mikles had fabricated Petitioner's admissions, we agree with the Fifth DCA

8   that there is no cause for "reversal of petitioner's conviction."  See Answer Exh. 2 at 14-15.  This is

9   true because as discussed more fully in Section III. A., the Court of Appeal correctly assessed that

10  "there was overwhelming evidence of petitioner's participation in, and culpability for, robbery and

11  murder in the course of that robbery."  Id. at 15.  Because the California Court of Appeals decision

12  denying Petitioner's claim was not objectively reasonable in its application of Supreme Court

13  precedent, Petitioner is not entitled to habeas corpus relief on this ground.

14       **C.    Ground Three:  Cumulative Error**

15       In his last ground for relief, Petitioner contends that the cumulative effect of the alleged

16  errors warrants reversal.  "The Supreme Court has clearly established that the combined effect of

17  multiple trial court errors violates due process where it renders the resulting criminal trial

18  fundamentally unfair. [Citation]  The cumulative effect of multiple errors can violate due process

19  even where no single error rises to the level of a constitutional violation or would independently

20  warrant reversal."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v.

21  Mississippi, 410 U.S. 284, 290 n. 3, 298, 302-303 (1973)); see also Whelchel v. Washington, 232

22  F.3d 1197, 1212 (9th Cir. 2000) (noting that cumulative error applies on habeas review).  Here, the

23  California Court of Appeal found the cumulative effect of the alleged errors did not warrant

24  "reversal, retrial, or dismissal.  See Answer Exh. 2 at 15.  The Court agrees that Petitioner's right to a

25  fundamentally fair trial was not implicated by these alleged errors; therefore, the state court's

26  decision finding no cumulative error is not an objectively reasonable application of Supreme Court

27

28

1  precedent and Petitioner is not entitled to habeas corpus relief on this ground.[15]

2  **IV.     Certificate of Appealability**

3          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

4  district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-

5  El v. Cockrell, 531 U.S. 322, 336 (2003).  The controlling statute in determining whether to issue a

6  certificate of appealability is 28 U.S.C. §2253, which provides that a circuit judge or judge may issue

7  a certificate of appealability where "the applicant has made a substantial showing of the denial of a

8  constitutional right."  Where the court denies a habeas petition, the court may only issue a certificate

9  of appealability "if jurists of reason could disagree with the district court's resolution of his

10  constitutional claim or that jurists could conclude the issues presented are adequate to deserve

11  encouragement to proceed further."  Miller-El, 537 U.S. at 326; Slack v. McDaniel, 529 U.S. 473,

12  484 (2000).  While the Petitioner is not required to prove the merits of his case, he must demonstrate

13  "something more than the absence of frivolity or the existence of mere good faith on his . . . part."

14  Miller-El, 537 U.S. at 338.  In the present case, the Court finds that reasonable jurists would not find

15  the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus

16  Petitioner's claim is not deserving of encouragement to proceed further.  Consequently, the Court

17  hereby recommends that Petitioner be DENIED a certificate of appealability.

18

19                                    **RECOMMENDATION**

20          Accordingly, the Court RECOMMENDS that:

21  1.       The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

22  2.       The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

23  3.       A Certificate of Appealability be DENIED.

24  _____

25  [15] Petitioner additionally requests an evidentiary hearing for "any claim as to which petitioner has presented a prima facie case . . . ."  See Petition at 265.  The Court finds Petitioner's requested hearing is unnecessary as the existing record is more than sufficient to resolve Petitioner's claims.  See Cullen v. Pinholster,      U.S.     , 131 S.Ct. 1388,      L.Ed.2d     ,

26  2011 WL 1225705 (April 4, 2011) (holding that that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); see also Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir.

27  1999); Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (An evidentiary hearing is not required on issues that can be resolved by reference to the state court record).

28

1         This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

2    United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

3    304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

4    Within thirty (30) days after being served with a copy, any party may file written objections with the

5    court and serve a copy on all parties.  Such a document should be captioned "Objections to

6    Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

7    filed within fourteen (14) court days after service of the objections.  The Court will then review the

8    Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to

9    file objections within the specified time may waive the right to appeal the District Court's order.

10   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11        IT IS SO ORDERED.

12   **Dated:   May 17, 2011**                    **/s/ Dennis L. Beck**

                                       UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28